**RING PLUS, INC., Plaintiff,**

v.

**CINGULAR WIRELESS LLC, et al., Defendants.**

**Civil Action No. 5:08–CV–42 DF.**

United States District Court, E.D. Texas, Texarkana Division.

July 17, 2009.

---

Frederic March Douglas, Law Offices of F.M. Douglas, Irvine, CA, Jerry Mowery, Attorney at Law, Beverly Hills, CA, Robert J. Schaap, Robert J. Schaap Law Offices, Woodland Hills, CA, Troy Alan Hornsby, Miller James Miller & Hornsby, Texarkana, TX, for Plaintiff.

Larry Dean Carlson, Barton Earl Showalter, David Osborn Taylor, Douglas Mark Kubehl, Baker Botts, Dallas, TX, Diane Devasto, Michael Edwin Jones, Potter Minton PC, Tyler, TX, for Defendants.

## *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

DAVID FOLSOM, District Judge.

Plaintiff filed suit on April 14, 2006, alleging infringement of United States Patent No. 7,006,608 (the "'608 Patent"). Dkt. No. 1. This case was originally filed in the Marshall Division and assigned Civil Action No. 2:06–cv–159 but was later transferred by agreement of the parties to the Texarkana Division and assigned Civil Action No. 5:08–cv–42. Dkt. No. 237. The Court granted summary judgment of non-infringement on June 4, 2008. Dkt. No. 280. On December 15, 2008, the Court held a bench trial on inequitable conduct, and the parties subsequently submitted proposed findings of fact and conclusions of law. Dkt. Nos. 318 and 319. Pursuant to Federal Rule of Civil Procedure 52(a), the following constitute the Court's findings of fact and conclusions of law. As discussed herein, the Court finds that the '608 Patent is unenforceable due to inequitable conduct.

## I. BACKGROUND

### *A. Parties*

Plaintiff Ring Plus, Inc. ("Ring Plus") is a privately held company incorporated in Texas. *See* Dkt. No. 1.

Defendant Cingular Wireless LLC has been renamed AT & T Mobility LLC, and is an indirect, wholly owned subsidiary of AT & T, Inc. which is a publicly traded corporation. *See* Dkt. No. 261.

Defendant Cingular Wireless II LLC has been renamed AT & T Mobility II LLC, and is an indirect, wholly owned subsidiary of AT & T, Inc. which is a publicly traded corporation. *See id.*

Defendant Cingular Wireless Corporation has been renamed AT & T Mobility Corporation, and is an indirect, wholly owned subsidiary of AT & T, Inc. which is a publicly traded corporation. *See id.*

Defendant AT & T Wireless Services, Inc. has been renamed New Cingular Wireless Services, Inc., and is an indirect, wholly owned subsidiary of AT & T, Inc. which is a publicly traded corporation. *See id.*

All of the above named defendants are collectively referred to as "Defendants."

*B. Jurisdiction*

This Court has jurisdiction over this patent infringement case under 28 U.S.C. §§ 1331 and 1338(a). Subject matter jurisdiction is not disputed. Joint Final Pre–Trial Order, Dkt. No. 306 at 2.

*C. Procedure*

On December 15–16, 2008, the Court held a bench trial regarding Defendants' counterclaim of unenforceability. Dkt. No. 310. Plaintiff presented the testimony of its unenforceability expert Mr. William Schaal, Esq. ("Mr. Schaal"). Defendants presented the testimony of their invalidity expert Dr. Stephen B. Wicker ("Dr. Wicker"), and presented the deposition testimony of Robert Schaap, Herbert Cohen, Gene Retske, and Karl Seelig.

At the bench trial, the Court reinstated Defendants' Motion for Sanctions (Dkt. No. 183), which had been terminated pursuant to a Final Judgement that the Court entered but subsequently vacated in light of Defendants' remaining counterclaims. 12/15/2008 Tr. (Dkt. No. 314) at 20; *see* Dkt. Nos. 281 and 284.

*D. Background of Issues Presented to the Court*

The '608 Patent is entitled "Software Algorithm and Method Enabling Message Presentation During a Telephone Ringing Signal." The '608 Patent issued on February 28, 2006. Generally, the '608 Patent relates to playing a sound presentation to a caller or recipient during a telephone ringing signal when the recipient's telephone line is not busy.

On June 10, 2004, the United States Patent & Trademark Office ("USPTO") issued an Office Action rejecting all pending claims based in part on United States Patent No. 5,321,740 to Gregorek ("Gregorek" or "Gregorek reference"). In response to that rejection, on December 9, 2004, the applicants submitted their "Amendment B," which amended the claims and made arguments to overcome the rejection based on Gregorek. Defs. Ex. 11. In a following Office Action, on April 28, 2005, the USPTO allowed all 35 pending claims subject to the applicants filing a terminal disclaimer to overcome a double patenting rejection.

Defendants advance three principal reasons why the '608 Patent is unenforceable because of inequitable conduct. First, Defendants assert that the applicants withheld from the USPTO a draft Information Disclosure Statement (the "Draft IDS") that would have disclosed material prior art. According to Defendants, this Draft IDS contained a statement concerning a prior art patent application of inventor Strietzel, U.S. Patent Application Serial No. 09/753,415, which published as U.S. Patent Publication No. 2001–0051517 ("Strietzel" or "Strietzel reference"), that directly contradicted arguments applicants made to the USPTO in support of patentability. Second, Defendants argue that the applicants falsely represented to the USPTO that a prior art U.S. Patent No. 4,811,382 to inventor Sleevi ("Sleevi" or "Sleevi reference") disclosed playing a message or other sound presentation when the line was busy. Third, Defendants assert that applicants falsely represented to the USPTO that Strietzel and Sleevi did not disclose a software algorithm for the operation of a telephone. Defendants have also requested a finding that this is an exceptional case and justifies an award of attorney's fees. Dkt. No. 217 at 9.

## II. ADMISSIBILITY OF EXPERT TESTIMONY

Defendants had disclosed an expert witness on the topic of unenforceability, Mr.

Martin J. Adelman, Esq. ("Mr. Adelman"), who wrote an expert report on the topic. At trial, Defendants did not present the report or testimony of Mr. Adelman but offered the testimony of Dr. Wicker on the topic of inequitable conduct. 12/15/2008 Tr. at 39:2–3. Defendants' attorneys represented to the Court that Dr. Wicker's testimony at trial would consist of material supported by Dr. Wicker's Invalidity Report. *Id.* at 38:20–22, 24–25.

Plaintiff objected and moved: (1) to strike Dr. Wicker's trial testimony on inequitable conduct as outside the scope of his Invalidity Report; and (2) to strike Dr. Wicker's testimony on "materiality" as having been formed for invalidity purposes rather than inequitable conduct purposes. 12/15/2008 Tr. at 47:17–19 and 64:22–23; 12/16/2008 Tr. (Dkt. No. 315) at 25:7–18. Plaintiff also renewed its motion to strike Dr. Wicker's testimony. 12/16/2008 Tr. at 58:11–15. The Court allowed Plaintiff a running objection to Dr. Wicker's testimony as being beyond the scope of Dr. Wicker's qualifications and expert report. The Court directed the parties to address the admissibility issues in their findings of facts and conclusions of law. 12/15/2008 Tr. at 47:20–48:5; 64:24–65:1; 12/16/2008 Tr. at 56:3–19 and 58:17–21.

Defendants objected that some of the opinions expressed by Plaintiff's inequitable conduct expert, William W. Schaal, were not disclosed in his expert report. The Court allowed defendants a running objection and again requested that the parties brief this issue in their proposed findings of fact and conclusions of law.

Dr. Wicker has a Ph.D. in electrical engineering and has "consulted extensively in the telecommunications industry, working with Motorola, Lockheed, Integrated Device Technologies, Unisys, Texas Instruments, and other corporations to develop advanced technologies for their telecommunications products." Wicker Invalidity Report, Pl. Ex. 8 at 1. His current research "focuses on wireless and wired information networks." *Id.* He has published extensively in the field of telecommunications. *See id.* at 256–279. Dr. Wicker is also a named inventor on three issued patents and is a named inventor on a pending patent application. *Id.* at 277; *see also* 12/16/2008 Tr. at 6–7.

At the bench trial, Dr. Wicker testified that Sleevi and Strietzel were material prior art references. In this regard, he applied the "Rule 56" standard for materiality (37 C.F.R § 1.56) (12/15/2008 Tr. at 48–49), which the Court of Appeals for the Federal Circuit has cited as a standard for materiality in the context of inequitable conduct. *Monsanto Co. v. Bayer Bioscience N.V.*, 514 F.3d 1229, 1237 (Fed.Cir. 2008). Dr. Wicker articulated in his Invalidity Report a standard for materiality that follows 37 C.F.R § 1.56(b)(2000). Pl. Ex. 8 at 32.

Dr. Wicker opined that Sleevi and Strietzel anticipated the claims of the '608 Patent. 12/15/2008 Tr. at 91–92, 101, and 106. He also opined that contrary to the statement made by applicants in the original patent application, Sleevi and Strietzel both disclosed software-based algorithms for operation of a telephone system. 12/15/2008 Tr. at 95–96; 12/16/2008 Tr. at 41. Dr. Wicker further opined that both Sleevi and Strietzel disclose a system that plays a busy signal and terminates a call if the recipient's line is busy, contrary to the applicants' representations in Amendment B. 12/15/2008 Tr. at 70–75 and 94–96; Defs. Ex. 11 at 19. Dr. Wicker concluded that these statements by the applicants in the application and in Amendment B were misrepresentations and were material.

Dr. Wicker opined that the applicants should have filed the Draft IDS that Mr. Schaap prepared (Defs. Ex. 452 (Dkt. No. 183 at Ex. 2e)) because: (1) the Draft IDS

identified references that Mr. Schaap characterized as being the "most relevant to the invention"; and (2) the statement in the Draft IDS that Strietzel disclosed an "algorithm" was inconsistent with a statement in the '608 Patent that "Strietzel and Sleevi both propose hardware based systems, but no software to operate those systems." '608 Patent at 3:28–29. Dr. Wicker also opined that a March 5, 2002 search report letter from Mr. Schaap (the "March 5, 2002 Letter") confirmed Mr. Schaap's appreciation of the materiality of the Sleevi and Strietzel references. *See* Defs. Ex. 18.

Dr. Wicker admitted that he is not an attorney. 12/16/2008 Tr. at 6:6–7. Dr. Wicker admitted that he has never practiced patent law and that he has never prepared a patent application for filing on behalf of a client. *Id.* at 6:8–14. Dr. Wicker admitted that he is not an expert on patent prosecution. *Id.* at 8:8–14. Dr. Wicker admitted that he is not an expert on what happens inside the USPTO and that he is not an expert "on how examiners on a day-to-day basis look at patent applications." *Id.* at 9:18–20 and 10:2–5. Dr. Wicker admitted that it is not part of his profession to regularly speak with patent examiners at the USPTO. *Id.* at 9:13–17.

Dr. Wicker admitted in his trial testimony that he is not an expert on "the legal side of inequitable conduct" and that he has only been asked to give his opinion on the technical aspects of whether a patent was material. *Id.* at 10:11–25. Dr. Wicker admitted that in his Invalidity Report he did not use or address the terms "inequitable conduct" or "duty of candor." *Id.* at 12:1–4, 13:21–14:1, 14:10–16, and 14:25–15:2. Dr. Wicker admitted that in his Infringement Rebuttal Report he did not use or address the terms "inequitable conduct" or "duty of candor." *Id.* at 14:20–15:2. Dr. Wicker admitted that in neither his Invalidity Report nor his Infringement Rebuttal Report did he apply or address the legal standard of "clear and convincing evidence" of an intent to deceive. *Id.* at 15:3–7; *id.* at 84:4–7.

Dr. Wicker admitted in his trial testimony that the "Misstatement" section of his Invalidity Report does not address whether Sleevi and Strietzel disclose playing a message only when a busy signal occurs. *Id.* at 20:9–12.

Dr. Wicker admitted that he did not address United States Patent No. 6,009,150 ("Kamel" or "Kamel reference") in his report. *Id.* at 154:6–9. When Defendants' counsel tried to examine Dr. Wicker about the Kamel reference, Plaintiff's counsel objected on the grounds that the testimony would be beyond the scope of Dr. Wicker's report. *Id.* at 154:15–155:3.

Dr. Wicker admitted during cross-examination at trial that he did not address Amendment B, or any alleged misrepresentations by Mr. Schaap therein, in his Invalidity Report. *Id.* at 19:1–21.

Dr. Wicker admitted on cross-examination that nowhere in the "Misstatement" section of his Invalidity Report did he discuss U.S. Patent No. 5,321,740 ("Gregorek '740 Patent") or citation thereof by the patent examiner. 12/16/2008 Tr. at 31:18–24. Dr. Wicker also admitted on cross-examination that nowhere in his Invalidity Report did he compare the claims of the Gregorek '740 Patent to those of Sleevi or Strietzel. *Id.* at 32:6–13.

Federal Rule of Civil Procedure ("Rule") 26(a)(2)(B) provides that an expert report must contain a complete statement of all opinions to be expressed and the basis and reasons supporting them. *Elder v. Tanner,* 205 F.R.D. 190, 192 (E.D.Tex.2001); *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.,* 467 F.3d 1355, 1368 (Fed.Cir.2006). "If a party fails to provide information or identify a wit-

ness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(c). Expert testimony can be excluded pursuant to Rule 37(c) to the extent it exceeds the material disclosed in the expert's report as required by Rule 26(a). *Air Turbine Tech., Inc. v. Atlas Copco AB,* 410 F.3d 701, 713 (Fed.Cir.2005); *see also O2 Micro,* 467 F.3d at 1368.

Dr. Wicker is well qualified with respect to the subject matter of wireless telecommunication. Dr. Wicker's Invalidity Report contains a discussion of purported misstatements by the applicants regarding Sleevi and Strietzel. Pl. Ex. 8 at 242–250. The Court can therefore properly consider Dr. Wicker's testimony regarding the extent of such misstatements and the materiality of the references and purported misstatements.

Defendants objected to testimony by Mr. Schaal regarding the Petition to Make Special on the grounds that the subject was outside the scope of Mr. Schaal's expert report. *Id.* at 77:22–24. The Court indicated that the parties could address this issue in their proposed findings of fact and conclusions of law. *Id.* at 77:22–24.

Mr. Schaal is a licensed patent attorney with a software background as a design engineer at Xerox Corporation. *Id.* at 65:23–66:12. Mr. Schaal is a partner at a law firm where he has worked for 16 years and that specializes in patent prosecution. *Id.* at 66:15–20. He has formal training as a patent attorney and his legal specialty is patent prosecution. *Id.* at 66:22–67:5. Mr. Schaal has rendered opinions on inequitable conduct in other cases. *Id.* at 67:15–18. He has prosecuted over 1,000 patent applications, and he has almost daily contact with the USPTO. *Id.* at 67:19–68:1. Mr. Schaal has an electrical engineering degree and he normally works on patents concerning telecommunications, networking, wireless, and cryptography. *Id.* at 68:2–8. Mr. Schaal testified that he has prosecuted about 50 patents related to telephone systems. *Id.* at 68:9–13. Mr. Schaal testified that he has prosecuted patents involving software, and that he is familiar with the term "software-based algorithm." *Id.* at 68:14–19.

Mr. Schaal testified that he formed his opinions regarding inequitable conduct by applying the legal standard set forth in *Star Scientific.* 12/16/2008 Tr. at 84:8–14; *see Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,* 537 F.3d 1357, 1365–1366 (Fed.Cir.2008) ("at least a threshold level of each element—*i.e.,* both materiality and intent to deceive—must be proven by clear and convincing evidence."). Mr. Schaal testified that one must first determine that there was an act or omission, then that the act or omission was done by a person with a duty of candor, then that it was material by clear and convincing evidence, then that there was an intent to deceive by clear and convincing evidence, and then one must weigh materiality and intent to determine whether there was inequitable conduct. 12/16/2008 Tr. at 84:12–25.

Mr. Schaal is qualified as an expert on the topic of inequitable conduct in this case, and Mr. Schaal's testimony can be properly considered regarding the '608 Patent, Sleevi, Strietzel, and prior art cited by the examiner of the '608 Patent.

## III. INEQUITABLE CONDUCT

### A. *Background*

As a preliminary matter, Plaintiff proposes in its Proposed Findings of Fact and Conclusions of Law that Strietzel is not prior art because it was published on December 13, 2001, less than one year before the June 28, 2002 filing date of U.S. Patent

Application No. 10/185,937 (the "'937 application"), which issued as the '608 Patent. Dkt. No. 318 at ¶ 124. Plaintiff notes that the '608 Patent is a continuation-in-part of an application filed April 11, 2002, and claims priority to a provisional application filed June 28, 2001. Plaintiff has not sufficiently shown, however, that the '608 Patent should be afforded a priority date earlier than June 28, 2002, for all of the claims. *See* Manual of Patent Examining Procedure ("MPEP") § 201.11(I)(A)-(B) (8th ed., rev. 7, July 2008) (regarding claiming benefit of provisional and nonprovisional applications); Dkt. No. 318 at ¶ 124 (Plaintiff proposed that "[a]t a minimum, one of the available filing dates for the '608 Patent can be considered, *arguendo,* as an invention date."). For example, Plaintiff has not sufficiently shown that all of the claims are adequately supported by the provisional application. *See id.* The Court accordingly declines to find, for purposes of assessing inequitable conduct, that Strietzel is not prior art. The Court is also mindful that 37 C.F.R. § 1.56 refers to material "information known to be material to patentability," which may be broader than only such references as clearly qualify as prior art under a subsection of 35 U.S.C. § 102.

The applicants, Karl Seelig and Anita Ericskon (now Anita Seelig), were represented by Robert J. Schaap in prosecuting the application that led to the '608 Patent. Karl Seelig is Chief Executive Officer and Chairman of the Board of Directors of Plaintiff. 12/16/2008 Tr. at 116:12–20; 9/14/2007 K. Seelig dep. at 241.[1] Mr. Schaap, a patent lawyer licensed in California, was at all times the lawyer who handled prosecution for the Seeligs before the USPTO of the patent application that issued as the '608 Patent. 10/3/2007 Schaap dep. at 79:3–16.[2]

Mr. Schaal testified that Mr. Schaap disclosed Sleevi and Strietzel in the background section of the application that led to the '608 Patent. 12/16/08 Tr. at 71:7–9. Mr. Schaal further testified that Mr. Schaap had disclosed in the background section all the information that is normally placed in an IDS, and that the patent examiner can be expected to look at that information in accordance with the MPEP. 12/16/2008 Tr. at 72:6–13. Mr. Schaap testified in deposition testimony that he did not believe that it was necessary to file an IDS for the '608 Patent application because he had already discussed Sleevi and Strietzel in the patent application. 3/29/2007 Schaap dep. at 230:24–231:25.

Mr. Schaap stated in deposition testimony that he did not believe, at least during prosecution, that the Sleevi reference disclosed software. 10/2/2007 Schaap dep. at 56:21–57:11 and 60:1–12; 10/3/2007 Schaap dep. at 268:19–20, 272:14–24 and 298:23–299:3. Similarly, Mr. Schaap stated that he did not believe, at least during prosecution, that the Strietzel reference disclosed software. 10/2/2007 Schaap dep. at 65:12–21, 68:22–69:4; 10/3/2007 Schaap dep. at 158:3–159:17, 272:14–24, 283:24–287:11, 291:23–25, and 298:23–299:3. Mr. Schaap also testified that he believes that Strietzel may refer to a piece of hardware when it refers to "programming processing means." 10/2/2007 Schaap dep. at 68:22–

1. Defendants also submit that "Anita Seelig is Secretary, CFO, and a director of plaintiff Ring Plus," citing the September 5, 2007 deposition of Anita Seelig at page 27, but Defendants have not shown that the deposition of Ms. Seelig is part of the record. Dkt. No. 319, Ex. at 4.

2. Defendants entered into evidence their designated portions of deposition testimony of Robert Schaap, Karl Seelig, and Herb Cohen. 12/16/2008 Tr. at 62:24–63:17; see also Defendants' Transcript Excerpts Corresponding to Deposition Designations, Dkt. No. 302. Plaintiff also submitted a copy of its designated deposition testimony to the Court.

69:4. Similarly, as to Sleevi, Mr. Schaap testified that "[e]ven pushing a bunch of switches mechanically or by hand can be considered to be programming." 10/2/2007 Schaap dep. at 60:1–12. Mr. Schaal testified at trial that the bases for his opinion that Sleevi does not disclose a software-based algorithm are that it does not use the terms "software" or "algorithm" and that the figures in Sleevi do not show a particular software mechanism. 12/16/2008 Tr. at 139:5–17.

Mr. Schaal testified that the bases for his opinion that Strietzel does not disclose a software-based algorithm are that it shows a processing "means" which does not indicate software. 12/16/2008 Tr. at 139:18–140:11. Mr. Schaal further testified that a "means" is shown in 35 U.S.C. section 112, paragraph 6 as structure or material and that the Strietzel figures show a router as a telecommunications "means." 12/16/2008 Tr. at 139:18–140:11. Mr. Schaal testified that it would not make sense to define the term "processing means" as "software" in Strietzel. 12/16/2008 Tr. at 139:18–140:11.

Mr. Schaal testified that even if Sleevi and Strietzel did disclose a software-based algorithm, the applicants' purported misstatements about those references in the '608 Patent only addressed the preamble to the claims of the '608 Patent and therefore were not material. 12/16/2008 Tr. at 140:14–18. Mr. Schaal testified that patent examiners do not give the preamble any weight unless it breathes life into the claims and that the preamble had no usefulness in getting the claims of the '608 Patent allowed. 12/16/2008 Tr. at 140:18–141:3.—

Mr. Schaap prepared a draft "Invention Disclosure Statement" (the "Draft IDS") [3] for filing in connection with prosecution of the application that issued as the '608 Patent. Defs. Ex. 28. This Draft IDS identified and discussed seven prior art references in addition to Sleevi and Strietzel, identified above, and a related Sleevi reference. The parties do not dispute that no one filed this Draft IDS with the USPTO. 10/2/2007 Schaap dep. at 208:15–18; 10/3/2007 Schaap dep. at 243:16–17, 245:8–9, and 260:19–261:6. Neither Mr. Schaap, Mr. Seelig, nor anyone else ever disclosed to the USPTO the seven prior art references identified in the IDS in addition to Strietzel, Sleevi, and the related Sleevi reference. 10/3/2007 Schaap dep. at 261:15–23.

Mr. Karl Seelig testified in deposition that he did not see the Draft IDS. 9/14/2007 K. Seelig dep. at 400:1–7 and 430:24–431:1; *see also* 12/16/2008 Tr. at 82:17–20; 10/2/2007 Schaap dep. at 125:8–126:2. The record nonetheless includes a letter from Mr. Schaap to Mr. Seelig referencing a "meeting at [Mr. Schaap's] office on February 2, 2004," and describing and enclosing a draft Petition to Make Special and the Draft IDS. Defs. Ex. 452 (Dkt. No. 183 at Ex. 2a). Defendants have not shown evidence, however, that Ms. Anita Seelig reviewed the Draft IDS or participated in any decision on whether to file an Information Disclosure Statement during the prosecution of the '608 Patent.

Mr. Schaal testified that it is common for patent practitioners to describe prior art in the specification of a patent application and sometimes not list the same prior

3. The IDS that Mr. Schaap prepared is titled "Invention Disclosure Statement" instead of "Information Disclosure Statement." Mr. Schaap testified in his deposition, however, that the use of the word "Invention" in the title of this document instead of "Information" was an oversight on his part, and that this document was in fact an Information Disclosure Statement, the purpose of which was to advise the USPTO of material prior art. 3/29/2007 Schaap dep. at 182:19–183:8; 10/2/2007 Schaap dep., at 36:4–10, 97:15–25, 98:9–14, 162:11–15, and 166:23–167:22; 10/3/2007 Schaap dep. at 260:19–24.

art in an IDS. 12/16/2008 Tr. at 85:13–86:13. Mr. Schaal testified that placing Sleevi and Strietzel in the background section of the '608 Patent indicates that there was no intent on the part of the applicants to deceive the USPTO. 12/16/2008 Tr. at 76:13–24.

Mr. Schaal also opined that the Draft IDS is not evidence that the applicants intended to deceive the USPTO because the Draft IDS was drafted to support a Petition to Make Special rather than to meet the duty of disclosure. 12/16/2008 Tr. at 77:15–20 and 81:18–19. Once the mailing of an office action rendered the Petition to Make Special moot, Mr. Schaap "just put everything back." 12/16/2008 Tr. at 81:19–23. Mr. Schaap testified in deposition that there was no need to file the Draft IDS because he had already discussed Sleevi and Strietzel, the most relevant prior art known, at length in the '608 Patent. 3/29/2007 Schaap dep. at 230:24–232:9; 10/2/2007 Schaap dep. at 40:1–15 and 168:3–169:7. Mr. Schaap also testified that the references in the Draft IDS other than Sleevi and Strietzel "were sort of folderol" and were cited "[j]ust to let, in effect, the examiner know [he] did the search." 10/2/2007 Schaap dep. at 196:7–14.

The March 5, 2002 Letter from Mr. Schaap to Mr. Seelig identified the Sleevi and Strietzel references. Defs. Ex. 18. Mr. Schaal testified that the applicants did not need to disclose to the patent examiner Mr. Schaap's written statement in the March 5, 2002 Letter that "Sleevi fairly well precludes broad patent protection" because the March 5, 2002 Letter did not say that Sleevi *excludes* patent protection. Defs. Ex. 18 at COHE000417; 12/16/2008 Tr. at 141:23–142:13. Mr. Schaal submitted that the applicants tailored their claims to obtain the patent protection that was available. *Id.*

Mr. Schaal also noted that the March 5, 2002 Letter stated that there were no other references more pertinent than Sleevi and Strietzel. 12/16/2008 Tr. at 71:3–7. The March 5, 2002 Letter stated, in relevant part:

> 3. *Details of Our Opinion*
>
> The one prior art reference which would appear to be most pertinent among those found in the search is the Kamel Patent No. 6,009,150, dated December 28, 1999.
>
> * * *
>
> However, as indicated above, it is believed that *Kamel is probably no more relevant to the invention which you propose than is the Strietzel et al., patent application or the Sleevi patent.* The remaining patents located in the search either relate to interactive queuing systems or otherwise to generation of messages when a caller is placed on a "hold".

Defs. Ex. 18 at COHE000419. Mr. Schaap's reference in this letter to "[t]he one prior art reference which would appear to be most pertinent" appears, in the context of the entire letter, to refer only to the "most pertinent" reference among those newly identified by the patentability search rather than among all references then known. *Id.*; *see* 10/2/2007 Schaap dep. at 188:2–12. Mr. Schaal opined that the March 5, 2002 Letter is strong evidence of good faith because Sleevi and Strietzel were identified in that letter and were then disclosed in the Background section of the '608 Patent. Defs. Ex. No. 18 at COHE000417–21; 12/16/2008 Tr. at 77:7–14.

Mr. Schaal also opined on the disclosure of the Gregorek '740 Patent, which was considered by the examiner during the prosecution of the '608 Patent. 12/16/2008 Tr. at 75:19–76:12. Mr. Schaal opined that the Gregorek '740 Patent did not provide

any non-cumulative disclosure that is relevant to the claims of the '608 Patent. *See, e.g.,* 12/16/2008 Tr. at 75:19–22. Mr. Schaal testified that he examined all of the prior art referenced in both the Draft IDS and the March 5, 2002 Letter and concluded that other than Sleevi, Strietzel, and Gregorek, none of those references were material because they were not directed at a ringing cycle or did not disclose terminating a call in a busy scenario. 12/16/2008 Tr. at 139:18–140:11 and 146:11–147:10.

*B. Legal Principles of Inequitable Conduct*

"To successfully prove inequitable conduct, the accused infringer must present 'evidence that the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [USPTO].'" *Star Scientific,* 537 F.3d at 1365 (quoting *Cargill, Inc. v. Canbra Foods, Ltd.,* 476 F.3d 1359, 1363 (Fed.Cir. 2007)). "Absent proof of a threshold level of both materiality and intent, there can be no determination of inequitable conduct." *Key Pharm. v. Hercon Labs. Corp.,* 161 F.3d 709, 719 (Fed.Cir.1998); *see also Purdue Pharma L.P. v. Endo Pharm. Inc.,* 438 F.3d 1123, 1128 (Fed.Cir.2006). "With regard to the deceptive intent prong, ... 'materiality does not presume intent, which is a separate and essential component of inequitable conduct.'" *Star Scientific,* 537 F.3d at 1366 (quoting *GFI, Inc. v. Franklin Corp.,* 265 F.3d 1268, 1274 (Fed. Cir.2001)).

"If a threshold level of intent to deceive or materiality is not established by clear and convincing evidence, the district court does not have any discretion to exercise and cannot hold the patent unenforceable regardless of the relative equities or how it might balance them." *Star Scientific,* 537 F.3d at 1367. "And even if this elevated evidentiary burden is met as to both elements, the district court must still balance the equities to determine whether the applicant's conduct before the PTO was egregious enough to warrant holding the entire patent unenforceable." *Star Scientific,* 537 F.3d at 1365 (citing *Monsanto Co. v. Bayer BioScience N.V.,* 363 F.3d 1235, 1239 (Fed.Cir.2004)).

To succeed on a claim of inequitable conduct due to failure to disclose material information, a party must show by clear and convincing evidence: (1) prior art that was material; (2) knowledge chargeable to an applicant of that prior art and its materiality; and (3) failure of the applicant to disclose the prior art, coupled with an intent to mislead the USPTO. *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 (Fed.Cir.1995).

Allegations of inequitable conduct for failure to disclose material information "may be rebutted by a showing that: (a) the prior art was not material; (b) if the prior art was material, a showing that the applicant did not know of that art; (c) if the applicant did know of that art, a showing that the applicant did not know of its materiality; or (d) a showing that the applicant's failure to disclose the art did not result from an intent to mislead the Patent Office." *Elk Corp. of Dallas v. GAF Bldg. Materials Corp.,* 168 F.3d 28, 30 (Fed.Cir. 1999) (citations omitted).

"The burden of proving inequitable conduct lies with the accused infringer." *Star Scientific,* 537 F.3d at 1365 (citation omitted). "The party asserting inequitable conduct must prove a threshold level of materiality and intent by clear and convincing evidence." *Atofina v. Great Lakes Chem. Corp.,* 441 F.3d 991, 1001 (Fed.Cir.2006) (citation omitted).

*C. Materiality*

37 C.F.R. § 1.56(a) states that an applicant has a duty to disclose "all information known to that individual to be material to patentability." *See also* 12/16/2008 Tr. at 82:6–13. "A patent applicant's duty to disclose is not limited to disclosing prior art. A patent applicant must disclose any material information to the PTO." *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1257 (Fed.Cir.1997) (citing 37 C.F.R. § 1.56(a)(1996)). The duty to disclose prior art under Rule 56 extends from filing until the issuance of the patent. MPEP § 2001.4. There is no duty to disclose prior art after a patent has issued.

The Federal Circuit has addressed several standards for materiality, including the Rule 56 standard, as amended in 1992, and the "reasonable examiner" standard. *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1316 (Fed. Cir.2006) (finding that "the 'reasonable examiner' standard and [Federal Circuit] case law interpreting that standard were not supplanted by the PTO's adoption of a new Rule 56"). Rule 56 states that information is material to patentability "when it is not cumulative to information already of record or being made of record in the application" and "[i]t establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim" or is inconsistent with another position taken by an applicant. 37 C.F.R. § 1.56(b)(2005). The "reasonable examiner" standard, as developed by case law, generally holds that "[i]nformation is material if a reasonable examiner would have considered it important to the patentability of a claim." *Ferring B.V. v. Barr Labs., Inc.*, 437 F.3d 1181, 1200 (Fed.Cir.2006); *see also Molins PLC*, 48 F.3d at 1179. "[A] patentee need not cite an otherwise material reference to the [US]PTO if that reference is merely cumulative or is less material than other references already before the examiner." *GFI*, 265 F.3d at 1274 (citation omitted); *see also Molins PLC*, 48 F.3d at 1179; 37 C.F.R. § 1.56(b).

A determination of whether a prior art reference is material and is not cumulative requires a "detailed factual analysis of the relevance of the teaching of that reference both with respect to the claims of the patent-in-suit and with respect to the other prior art references that were before the examiner." *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1367 (Fed.Cir.2003).

Statements directed to non-limiting language within the preamble of the claims have been found not material. *Intirtool, Ltd. v. Texar Corporation*, 369 F.3d 1289, 1296 (Fed.Cir.2004) (overturning finding of material misrepresentations in part because "references to 'punching and connecting' in the prosecution history reference merely preamble features of the invention.").

Mr. Schaal provided four bases for his opinion that all material prior art had been disclosed. 12/16/2008 Tr. at 71:3. First, the March 5, 2002 Letter "explicitly stated that there was no other references more pertinent than Sleevi and Strietzel." *Id.* at 71:3–7. Second, the applicants disclosed Sleevi and Strietzel in the Background section of the '608 Patent. *Id.* at 71:7–9. Third, the unfiled 2004 IDS draft documents were not finalized and, pursuant to 37 C.F.R. § 1.97(h), the contents of an IDS are not necessarily admitted to be material. *Id.* at 71:10–17; 37 C.F.R. § 1.97(h) ("The filing of an information disclosure statement shall not be construed to be an admission that the information cited in the statement is, or is considered to be, material to patentability as defined in § 1.56(b)"). Fourth, Dr. Wicker's report did not mention any prior art as being

material other than Sleevi and Strietzel. *Id.* at 71:18–25.

Sleevi and Strietzel were disclosed in the specification of the '608 patent itself, so the Court rejects Defendants arguments regarding purported nondisclosure of Sleevi and Strietzel. Also, Mr. Schaal's testimony, in light of all of the evidence presented, is persuasive regarding the cumulativeness of the references not disclosed to the USPTO. This inequitable conduct dispute instead turns on representations that the applicants made regarding Sleevi and Strietzel. In this regard, the Court notes that the applicants represented in Amendment B that they had "very carefully examined the other references including, for example, Sleeviy [*sic*] U.S. Patent No. 4,811,382 and the Strietzel U.S. Patent publication." Defs. Ex. 11 at CW171989.

*1. Disclosure of Software in Sleevi and Strietzel*

Defendants also argue that Sleevi and Strietzel clearly disclose software algorithms and that applicants' falsely represented in the specification of the '608 patent that "Strietzel and Sleevi both proposed hardware based systems, but no software to operate those systems." '608 Patent at 3:28–29. Defendants also point to a statement in the Draft IDS regarding Strietzel that "[a]n algorithm for operation of the system is disclosed." Defs. Ex. 28 at 3.

According to Mr. Schaal, Mr. Schaap correctly represented in the Background section of the '608 Patent that "Strietzel and Sleevi both propose hardware based systems, but no software to operate those systems," because neither reference explicitly proposes software for operating the telephone system. 12/16/08 Tr. at 73:18–74:6; Defs. Ex. 1 at 3:25–34.

A fair reading of at least Strietzel, however, includes disclosure of software. For example, even on the cover page of Strietzel, the Abstract discloses that "selective association [of advertisements] is carried out by the processing means." Defs. Ex. 173. Further, Figure 1 illustrates a "message database 102," a "processing means 104," a "router 106," "fixed network, Internet, wireless 110," and "fixed network, Internet, wireless 112." *Id.* Figures 7–9 are flow charts that apparently illustrate algorithms. Figure 10 illustrates a communication system 1000 that is connected to a packet data server 1008 and the Internet 1010. Strietzel also discusses a "programming processing means 104." *Id.* at [0036]. Strietzel even explains that the "telecommunications advertising means 100 may be integrated into a wireless system or the Internet." *Id.* at [0028]. Even through Strietzel does not explicitly use the term "software," the presence of these computer-related components, as well as description thereof, indicates that Strietzel would have been understood by a person of ordinary skill in the art to disclose software-based algorithms.

As for Sleevi, the implicit disclosure of software is less clear than in Strietzel. Still, Sleevi discloses that "switching can take place by the action of mechanical switches, although *stored program controlled digital switching is more often used in modern switching systems.*" Defs. Ex. 174 at 5:51–54 (emphasis added). Further, "the switching network 20 can be programmed" and "[i]f the program of the control complex 24 indicates that the calling party is to receive a recorded message, the transmission path 40 is switched onto the communications path" and "[t]he control complex 34 then activates the message announcer 36 in order to initiate the application of a recorded message to the line of the calling party." *Id.* at 6:35–36 and 50–59. Thus, Sleevi would also have been understood by a person of ordinary skill in

the art to disclose software-based algorithms.

Even Mr. Schaap testified in deposition, albeit equivocally, that the Sleevi and Strietzel prior art references "talked about using software for the operation of a telephone system" and "proposed a telephone system that was operated at least in part by software." 10/3/2007 Schaap Dep. at 275:6–278:8. Mr. Schaap characterized the level of disclosure of Sleevi and Strietzel as to software as "kind of a wish list" akin to proposing a "zero-friction bearing." *Id.* at 276:14–16 and 277:1–6. Still, Mr. Schaap acknowledged that "I think it goes without saying that you're going to use software. Nobody uses switches. Those went out in the 1940s. Sure, they're all going to be software-operated switches now...." *Id.* at 276:8–12. Mr. Schaap apparently believed that Sleevi and Strietzel disclosed software but were not sufficiently enabling as to software to be prior art as to software, stating that "they didn't show any system for doing it." *Id.*[4] The applicants' intent is discussed below, but Mr. Schaap's deposition testimony, as well as the opinions presented at trial by Dr. Wicker, persuade the Court that Sleevi and Strietzel disclosed software, or at least the use of software, and that the applicants' statements to the contrary were material misrepresentations.

*2. Disclosure in Sleevi and Strietzel of Terminating Call Rather than Playing a Sound Presentation*

Defendants have argued that both Sleevi and Strietzel disclose, when a recipient's line is busy, applying a busy signal and terminating a call rather than playing a sound presentation. 12/15/2008 Tr. at 70–75 and 94–96. Defendants submit that in Amendment B, filed November 30, 2004, the applicants cited Sleevi and Strietzel but went on to state that "one of the major distinctions between the applicant's system and Gregorek and, for that matter, *any other reference known to the applicant* is the fact that the applicant's system *only generates that message when the phone line between the caller and the recipient is*

4. *See also id.* at 268:5–24:

A. ... To say, yes, of, we can use software to do this, well, that doesn't tell what the software is, how it works, anything. It doesn't say anything. It just says, hey, we're going to use software. Of course you're going to use software. That's obvious. But that doesn't tell you anything.

Q. But didn't you tell the patent office the opposite of that? You told the patent office that Sleevi did not propose a system that had software for the operation of the system.

A. No, I said he didn't include—

[Objection]

A. I said he did not disclose a software system for it, and he didn't. He said, oh, I'm going to use a software system. But you know, that's like saying I'm going to have an automobile that'll run at the speed of 500 miles an hour, but I don't tell anybody how I'm going to do that.

*See also id.* at 272:14–24:

Q. So you made the decision that the software that was disclosed in Sleevi and Strietzel, that there was an insufficient description of that software or an insufficient description of how it could be done or precisely what it was, so you didn't even tell the patent office about it?

[Objection]

A. There is no disclosure of software. They're saying we're going to use it, but we're not telling you how it works.

*See also id.* at 285:24–286:4:

Q. Okay. Now, 104, what does it say inside the box there, 104?

A. Processing Means.

Q. Okay, Is it possible that the processing means could be a computer processor?

A. Sure could.

[Objection]

Q. Could it be hardware?

[Objection]

A. It could be, yes, either or—or both or a combination of both of them.

Q. Now, you testified that the processing means may be software, may be hardware?

A. Sure.

*not busy.*" Defs. Ex. 11 at 19 (emphasis added). Thus, Defendants submit, the applicants "falsely characterized the Sleevi and Strietzel references on the one feature that the examiner could not find in the prior art." Defs.' Proposed Findings of Fact and Conclusions of Law, Dkt. No. 319-2 at 15. Dr. Wicker did not address this statement by the applicants in his Invalidity Report, and the Court therefore does not rely on Dr. Wicker's testimony in analyzing this issue.

Strietzel discloses that a "busy tone can be replaced by one or more advertisements." Defs. Ex. 173 at [0064] and Claim 2 ("The wireless communication system of claim 1, wherein the advertisements ... are used to replace a busy signal that would otherwise be sent to the source and/or destination.").

Two of Plaintiff's own witnesses, however, indicated that Mr. Schaap's description of Sleevi and Strietzel to the USPTO was false in this regard. First, Herb Cohen was a technical advisor that Mr. Seelig hired to develop a prototype related to the system disclosed in the '608 Patent. 8/16/2007 Cohen dep. at 26:1–23. Mr. Cohen assisted with the application that resulted in the '608 Patent. *Id.* at 32:4–17; *see also* 3/29/2007 Schaap dep. at 49:9–51:7. Mr. Cohen testified in his deposition that he remembered the Sleevi and Strietzel prior art references, that he read and studied Sleevi, and that he compared Sleevi to the claims in the patent application. 8/16/2007 Cohen dep. at 113:13–114:5, 218. According to Mr. Schaal's testimony, Mr. Cohen worked with Mr. Schaap in connection with the prosecution of the '608 Patent. 12/16/2008 Tr. at 129–30. Mr. Cohen testified in his deposition:

> Q: Okay. So based on your—your—sort of your prior knowledge of the Sleevi patent and the review that we've done today, you understand that in the Sleevi patent, the messages that are played are played in the situation when the line is not busy—when the recipient's line is not busy?
>
> [Objection]
>
> THE WITNESS: That's—that's the way I read the explanation in the—in the major section of the patent.
>
> BY MR. KUBEHL:
>
> Q: By contrast, when the line is busy, messages are not played, instead busy tones are generated, correct?
>
> [Objection]
>
> THE WITNESS: That's the way I read the Sleevi patent, yes.

12/16/2008 Tr. at 129:6–18.

Second, Plaintiff's expert on infringement and validity was Gene Retske. Mr. Retske attended the bench trial on December 15, 2008, and part of December 16, 2008, but left before completion of the trial and without testifying. In his deposition, Mr. Retske testified that "in Sleevi, the messages or announcements are played only when the line is not busy." 12/16/2008 Tr. at 131:1–11.

Although Strietzel discloses replacing a busy signal with an advertisement, a fair reading of these references, as confirmed by Messrs. Cohen and Retske at least as to Sleevi, is that Sleevi and Strietzel disclose implementations wherein a busy signal results in a call ending without playing an advertisement. On balance, the testimony is persuasive that the applicants made a material misrepresentation in Amendment B by stating that Sleevi and Strietzel only disclosed playing a message regardless of whether the recipient's line was busy. Further, the Court finds a relatively high level of materiality here because, for example, Sleevi and Strietzel were the most pertinent, "critical" references and because the applicants' statements plainly misrepresented those refer-

ences, as discussed above. 10/2/2007 Schaap dep. at 168:23–169:7.

Regarding the Draft IDS, Defendants have not sufficiently shown that any of the references listed therein other than Strietzel and Sleevi were material. *See, e.g.,* 12/16/2008 Tr. at 145:17–147:10.

*D. Intent*

"[T]he alleged conduct must not amount merely to the improper performance of, or omission of, an act one ought to have performed. Rather, clear and convincing evidence must prove that an applicant had the specific intent to ... mislead[ ] or deceiv[e] the PTO." *Star Scientific,* 537 F.3d at 1366 (quoting *Molins PLC,* 48 F.3d at 1181 (Fed.Cir.1995)). "[W]hen examining intent to deceive, a court must weigh all the evidence, including evidence of good faith." *McKesson Info. Solutions, Inc. v. Bridge Med., Inc.,* 487 F.3d 897, 917 (Fed.Cir.2007) (quoting *Akron Polymer Container Corp. v. Exxel Container, Inc.,* 148 F.3d 1380, 1382 (Fed. Cir.1998)); *see also Symbol Techs., Inc. v. Opticon, Inc.,* 935 F.2d 1569, 1582 (Fed. Cir.1991); *Baxter Int'l, Inc. v. McGaw, Inc.,* 149 F.3d 1321, 1330 (Fed.Cir.1998). "Further, the inference must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard." *Star Scientific,* 537 F.3d at 1366 (citation omitted).

"[W]hile 'smoking gun' evidence is not required in order to find intent to deceive, 'the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive.'" *Warner–Lambert Co. v. Teva Pharm. USA, Inc.,* 418 F.3d 1326, 1346 (Fed.Cir.2005) (quoting *Kingsdown Med. Consultants Ltd. v. Hollister, Inc.,* 863 F.2d 867, 876 (Fed.Cir. 1988) (en banc)). "Proof of high materiality and that the applicant knew or should have known of that materiality makes it difficult to show good faith to overcome an inference of intent to mislead." *Semiconductor Energy Lab. Co., Ltd. v. Samsung Elecs. Co., Ltd.,* 204 F.3d 1368, 1375 (Fed. Cir.2000).

On balance, Defendants have made a sufficient showing of intent to deceive the USPTO for the Court to find inequitable conduct, as discussed herein.

As a preliminary matter, Defendants argue that several limitations of the claims of the '608 Patent "rely on the preamble phrase 'algorithm' for antecedent support" and that the applicants relied on the preamble to distinguish Sleevi and Strietzel as not disclosing algorithms or software. Dkt. No. 319–2 at 19. Nonetheless, the applicants apparently used the term "algorithm" in conjunction with "software" in the '608 Patent. The applicants seem to have intended to argue that Sleevi and Strietzel did not disclose software-based algorithms. Also, the Draft IDS characterized Strietzel as disclosing "an algorithm," but the Draft IDS did not mention "software." Defs. Ex. 452 (Dkt. No. 183 at Ex. 2e at RP030396). On balance, the Court rejects Defendants' argument for purposes of its inequitable conduct analysis.

The applicants' discussion of the Sleevi and Strietzel references in the Background section of the '608 Patent is inconsistent with an intent to hide those references, but the applicants represented in the '608 Patent that Sleevi and Strietzel do not disclose "software to operate those [telephone] systems." Defs. Ex. 1 at 3:26–27. Mr. Schaap claimed that he believed these representations were accurate because he believed that Sleevi and Strietzel were not sufficiently detailed as to software. Mr.

Schaap characterized the level of disclosure of Sleevi and Strietzel as to software as "kind of a wish list" akin to proposing a "zero-friction bearing" because "they didn't show any system for doing it." 10/3/2007 Schaap dep. at 276:8–16 and 277:1–6. But as noted above, even a cursory review of the Figures and Abstract of Strietzel indicate that Strietzel discloses software-based algorithms. Also as noted above, Sleevi discloses software-controlled switches, at least upon a full reading, and the applicants represented that they "*very carefully examined* Sleeviy [*sic* ] U.S. Patent No. 4,811,382 and the Strietzel U.S. Patent publication." Defs. Ex. 11 at CW 171989 (emphasis added). Plaintiff's position that the applicants believed their misrepresentations regarding Sleevi and Strietzel to be true is not credible under these circumstances.[5] *Cf. Bruno Independent Living Aids, Inc. v. Acorn Mobility Services, Ltd.,* 394 F.3d 1348, 1354 (Fed. Cir.2005) (finding that patentee "has not proffered a credible explanation for the nondisclosure, and an inference of deceptive intent may fairly be drawn in the absence of such an explanation.")

As to the statement in Amendment B that "the applicant's system only generates [a] message when the phone line between the caller and the recipient is not busy," Strietzel does discloses that a "busy tone can be replaced by one or more advertisements." Defs. Ex. 173 at [0064] and Claim 2. Nonetheless, a full and fair reading of Sleevi and Strietzel indicate that the applicants misrepresented those references, as discussed above with regard to materiality. Here again, the applicants' purported beliefs regarding these references are not credible.

The single most reasonable inference from the evidence discussed above is that the applicants intended to deceive. The applicants' mere denial of intent to deceive is insufficient, and Plaintiff has not presented sufficient evidence of good faith to prevent a finding of intent.

### *E. Conclusion*

Having weighed both materiality and intent, the Court finds that Defendants have shown by clear and convincing evidence that the applicants for the '608 Patent made material misrepresentations coupled with an intent to deceive the USPTO.[6] Further, Plaintiff has not made a sufficient showing of equitable considerations to outweigh the findings of materiality and intent. The Court thus finds that the '608 Patent is unenforceable due to inequitable conduct.

## IV. EXCEPTIONAL CASE STATUS AND MOTION FOR SANCTIONS

For an exceptional case, the court may find unfairness or bad faith in the losing party's conduct or some other equitable consideration of similar force which makes it grossly unjust that the winner of the lawsuit be left to bear the burden of its own attorney's fees. *PPG Industries, Inc. v. Celanese Polymer Specialties Co., Inc.,*

5. The Court notes, for example, that Mr. Schaap is a highly experienced patent prosecutor. At the time he testified at his October 2, 2007 deposition, Mr. Schaap had been registered with the USPTO for approximately 45 years. 10/2/2007 Schaap dep. at 35:20–22; 10/3/2007 Schaap dep. at 158:8–11.

6. At a minimum, Defendants have shown by clear and convincing evidence that the applicants made material misstatements coupled with a "reckless indifference to the truth" and an "absence of evidence of good faith." *Hewlett–Packard Co. v. Bausch & Lomb, Inc.,* 882 F.2d 1556, 1562 (Fed.Cir.1989) (citation omitted) (identifying " '[s]tudied ignorance' of the facts and a 'reckless indifference' to the truth" as circumstances that "may give rise to an inference of wrongful intent").

840 F.2d 1565 (Fed.Cir.1988); *see also* 35 U.S.C. § 285. The Court has considered the arguments and evidence presented in briefing on Defendants' Motion for Sanctions. *See* Dkt. Nos. 183, 191, 196, and 202.

Defendants argued in their motion for sanctions that the Court should dismiss Plaintiff's suit and award attorney's fees to Defendants. *See* Dkt. No. 183. Because the Court has since granted summary judgment in favor of Defendants, Defendants' motion is moot as to the request for dismissal. *See* Dkt. No. 280. The Court considers Defendants' request for attorney's fees as part of Defendants' request for exceptional case status.

Defendants argue that Plaintiff's sanctionable conduct includes, for example, failure to preserve documents, failure to search for relevant documents, and failure to produce relevant documents known to Plaintiff. *See* Dkt. No. 183. Defendants argue, for example, that Plaintiff failed to fulfill its duty to preserve documents starting April 12, 2001, which is the earliest date as to which Plaintiff has asserted privilege. Dkt. No. 183 at 7.

Plaintiff responds that it had no duty to preserve documents until issuance of the patent-in-suit. Dkt. No. 191. Plaintiff also submits that Mr. Seelig's "hotmail.com" e-mail account, which contained pre-2005 e-mails, "was cancelled after a period of dormancy." *Id.* at 10–11. Plaintiff also submits that Mr. Seelig's laptop computer, which contained several e-mails, was stolen from Mr. Seelig while he traveled in Europe in May 2006. *Id.* at 11. Then, Plaintiff submits, a desktop computer containing e-mails was stolen from Plaintiff in May 2007. *Id.* at 12. As to Plaintiff's failure to produce the March 5, 2002 Letter regarding a search report, which was produced by a third party instead, Plaintiff offers that "Defendants are not in any way prejudiced because this document was produced by one person rather than another." *Id.* at 19.

In reply, Defendants argue, for example, that Plaintiff's assertion of work product protection carries an obligation to preserve documents and that, at a minimum, Plaintiff anticipated litigation at the time of drafting a Petition to Make Special in February 2004. Dkt. No. 196 at 1–2. Defendants also argue that regardless of whether Mr. Seelig intended to lose or destroy e-mails, Mr. Seelig and Plaintiff had a duty to preserve and failed to do so. *Id.* at 3. Defendants also identify, for example, the March 5, 2002 Letter and the Draft IDS as documents that Plaintiff failed to produce and that were instead obtained through third parties. *Id.* at 5–7.

In sur-reply, Plaintiff submits that it "has complied, albeit sometimes belatedly, with all its discovery obligations and Defendants have not been prejudiced by [Plaintiff's] fallibility and inexperience." Dkt. No. 202 at 2. Plaintiff also alleges that Defendants' use of an Internet-based meeting service known as "WebEx" resulted in loss of comments that Defendants' counsel exchanged with Mr. Wicker, one of Defendants' experts. *Id.* at 9–11. Plaintiff also admits that it has failed to produce: (1) DVDs of a press conference, which were lost; (2) "single word, promotional speech, prompt cards naively thrown away by Anita Seelig"; and (3) a file that was mailed by Mr. Retske, one of Plaintiff's experts, to Mr. Seelig but that "never arrived." *Id.* at 5.

Plaintiff's conduct has been less than exemplary, and Defendants' allegations do not "border on frivolous," as Plaintiff proposes. *Id.* at 11. As another example, Plaintiff failed to submit its portion of the Joint Final Pretrial Order until the last business day before trial, a full week after the deadline set by the Court, despite a reminder from Defendants on the due date

set by the Court. *See* 12/15/2008 Tr. at 5:15–16:4.[7] Nonetheless, to the extent Defendants seek sanctions in the form of dismissal, the Court has already granted summary judgment in favor of Defendants. *See* Dkt. No. 280. On balance, Plaintiff's conduct has not been sufficiently egregious to justify an award of attorney's fees.

Defendants' Motion for Sanctions (Dkt. No. 183) is therefore denied, and the Court declines to find that this is an exceptional case.

## V. CONCLUSION

For at least the foregoing reasons, Defendants have shown, by clear and convincing evidence, that the '608 Patent is unenforceable due to inequitable conduct.

For at least the foregoing reasons, Defendants' Motion for Sanctions (Dkt. No. 183) is hereby **DENIED**. The Court declines to find that this is an exceptional case.

To the extent that any of the above findings of fact are more appropriately conclusions of law, the Court hereby adopts them as such. To the extent that any of the above conclusions of law are more appropriately findings of fact, the Court hereby adopts them as such.

**IT IS SO ORDERED.**

---

7. The Court reduced Plaintiff's time limit for its trial presentation from seven and a half hours to five hours but reserved for consideration whether to impose any additional sanctions. 12/15/2008 Tr. at 18:13–15 and 19:14–18.